Good afternoon. Illinois Appellate Court, 1st District Court is now in session. The 6th Division, the Honorable Justice Sharon O. Johnson presiding, case number 23-0551, 1st American Bank v. Poplar Creek. Good afternoon. I'm Justice Sharon O. Johnson, presiding judge of the 6th Division. I am joined by my colleagues, Justice Michael B. Klingman and Justice Carl A. Walker. Each party will be given 20 minutes in order to present their arguments on today, with the appellate being given the opportunity to reserve time for rebuttal. So I'd like to begin by having the appellate's counsel state his appearance for the record. Good afternoon, Your Honor. This is Seth Horvath of Nixon Peabody LLP for Mr. Douglas Altenberger. I have some other co-counsel involved. I'm going to be taking their argument time. I'll let them introduce themselves as well. Okay, very well. Good afternoon, Your Honors. Tim Herman on behalf of James E. Moser, independent executor of the estate of George A. Moser. As Mr. Horvath alluded to, any time that I'm allotted will be for him to argue on behalf of appellant's behalf. Thank you. Thank you. Good afternoon, Your Honors. Amy DeLeo on behalf of appellant George M. Moser. And with Mr. Herman, any time I'm allotted, I will be giving to Mr. Horvath with regard to arguments. Thank you. Very well, thank you. Attorney Horvath, will you be reserving any time for rebuttal? I will, Your Honor. May I reserve three minutes at the end for rebuttal? Very well. Okay, and Counsel Cora Pelly, please state your appearance for the record. Good afternoon, Your Honors. Neil Levin on behalf of First American Bank. And I'll allow my co-counsel to introduce herself. Good afternoon, Your Honors. Shira Eisenberg, also on behalf of First American Bank. Though Neil Levin will be doing the argument on behalf of First American Bank. Okay, very well. Attorney Horvath, you may begin. Thank you, Your Honor, and may it please the court. As already announced, Seth Horvath for Mr. Altenberger and as already announced as well, my co-counsel have ceded their argument time to me on behalf of their clients, George Moser Jr. and the estate of George Moser, given that the issues among those parties overlap. This appeal is from the denial of a petition for satisfaction of a judgment entered against the debtors. It's the second time the case is before this court. There are three grounds for reversing the circuit court's judgment. First, the court erred in finding that under the UCC, the bank's decision to retain rather than to sell a tax increment finance note pledged as collateral for the bank's loan did not satisfy the judgment. Second, the court erred in finding that under equitable principles, the bank's decision to retain the TIF note didn't satisfy the judgment. And third, the court erred in finding that under the common law of judgments, the payments and credits the bank received from sources other than the debtors didn't apply to satisfying the judgment. The total allowable recovery against the debtors is about $650,000 is severally recoverable from each individual debtor. And to date, the bank has recovered almost $4.3 million. We are asking this court to find that the judgment has in fact been fully satisfied. Subject to questions, I'll focus most of my remarks on the UCC issue that I alluded to a few moments ago. As an overview of that issue, Article 9 of the UCC governs secured transactions. The bank had two options under Article 9 with respect to the TIF note. Option 1 was to accept the TIF note under Section 9620 of the UCC, and Option 2 was to sell the TIF note under Section 9610. Isn't there an Option 3, which is what happened in the trial court? The Option 3, Your Honor, to the extent there was one, is there was just no acceptance of the TIF note and there was no sale of the TIF note. No, you've created this binary choice, but that isn't necessarily what the UCC says. So I'm trying to understand because I very closely read the UCC, and it was one of my favorite classes in law school. I don't know how many people could say that. Please, when I read the language of the sections that are in the briefs, I see a lot of language using the words may, and I know you make an argument that mandatory not permissive, but when you look at all the language and the case law that pretty much does I think doesn't really say what you say. I mean what case? Give me a case that says you have to have these two options. Give me the case. What case in Illinois has said that, or anywhere? Your Honor, there's no Illinois case that we've cited that directly addresses the distinction between acceptance on the one hand and a commercially reasonable sale on the other, but as we've submitted in our briefs, the only reasonable interpretation of the relevant UCC provisions is that there has to be a choice, and even though there is discretionary language in the applicable provisions of the UCC, when those provisions are read as a whole and in conjunction with one another as they must be, the only logical conclusion is that the bank has to pick. It has certain... But you're skipping certain things, okay? You talk about the comments. Everybody talked about you didn't mention the comments just now, and nor did he mention the guarantees themselves, the tip note, the pledge. All of that has to be read in conjunction, and so the fact that there's no Illinois case out there, you would think that if this is such a choice, some case would have... Give me a case from outside of Illinois that said this is the only two options. Is there one? I think there's four cases that we've raised for the Court's consideration, and they're not Illinois cases, but they are cases that are... I read those cases, but again, their situations are much different and can be easily distinguished from what we have here, but if you want to go through it, I can make your argument. All those cases share a common ground, Your Honor. They share the common ground of a secured creditor holding collateral and then trying to collect the deficiency judgment after the collateral has been held. In all of those cases, it was either found that the value presumption under Section 926 of the UCC arises, or it was found that there was not commercially reasonable conduct in withholding the collateral from sale. The cases are all instructive on this point, and we think that they're fair guidance under Illinois law, even though there are no Illinois cases. But they don't say the point that you made. I mean, they don't come out and say, would you believe the law to be? I'll put it that way. I mean, you haven't given us any case in the country that says in this situation, which is different than those situations, and we don't need to go through it, but I do think that those situations are a lot different when you have a non-recourse note here that even your experts, you know, everything has a value, yes, but that value could be almost nothing. There's no market for these, for the TIF, and it only had a value, you know, it ran out, and you know, that value wasn't very much. And if you look at the language, I'm just trying to understand your argument, because it seems to me that you're relying on something that you know, we'd be making new law here. Do you disagree? I think, Your Honor, you would be making law based on a reading of the statutory language, a reading of the comments, a reading of instructed cases from other jurisdictions, and the collective analysis of those sources. As far as the actual language of the statutes goes, as we've submitted, the language in each individual provision is framed in a discretionary fashion, but when you read the provisions together, the only fair result is to read them to require the bank to choose an option. Mr. Horvath, I actually do read it the way that you do, but the difficulty that I have is the pledge, and the pledge clearly says, and this is what Justice Hyman is trying to point out to you now, that you've got to still take all of these things together. And the pledge clearly says that the bank shall not be obligated to make any sale of the tip note if it shall determine not to do so. And that's exactly what it says. And this is the agreement that they signed, and that's where my struggle is. So if you can just help me, tell me why I should ignore the pledge. Your Honor, I don't think, thank you for the question, that you have to ignore the pledge. I think you have to read the pledge as against the law, as against the backdrop of the UCC. And the TIF pledge does not displace the UCC. It doesn't contain any language that says the UCC does not apply under the terms of the TIF pledge. The TIF pledge simply sets forth a series of provisions that were intended to govern the procedures surrounding a situation where there was a default on the collateral. But it doesn't replace the underlying law, the underlying Illinois law that applies here. There's several pieces of the TIF pledge... Wait a minute, there is no Illinois law that applies here, but we just went over that. No case law says what you say. This is something you are asking us to do for the first time. We just went through that. Am I wrong? Your Honor, by Illinois law, I mean the Illinois UCC and the principles of interpreting that statute, the Illinois UCC. And we go back to looking at the language. We also go back to looking at the comments. And I do think there's some instructive language in the comments of the UCC that we've highlighted, particularly if you look at comments 2 and 9 in Section 9620 of Article 9 of the UCC. Both of those comments tie together the concepts of acceptance and sale. Comment 2 of Section 9620 says, this section deals with strict foreclosure, that is to say acceptance, a procedure by which the secured party acquires the debtor's interest in the collateral without the need for a sale or other disposition. And then here's the connector under Section 9610. So there's a link being drawn in the acceptance provision to the sale provision. And similarly in Comment 9, it says, legislature should conform other non-UCC laws that involve collateral ownership so that they mesh well with this section and Section 9610. So there's guidance in the comments that links the two concepts that we're putting forward to the court as the binary choice, the acceptance and the sale. And between that and a reading of the statutory provisions that ought to be interpreted in a way that requires the bank to make a choice in fairness to the debtor, there's support for reading the Illinois UCC in this fashion. And there's also- And that is what you are talking about is what he read. And where in this UCC says that contracts language and a guarantee is not to be enforced. Do you have a case? I don't believe you've cited a case that we should ignore the contract language. Have you? We haven't cited that type of case and we're not asking the court to ignore the contract language in the TIF pledge. We're just asking the court to acknowledge that the TIF pledge has to be read against the Illinois UCC. But anybody, there's a freedom of contract in Illinois. And that contract in which the bank relied in giving this risky loan, the bank relied on it. And now you're saying that we should not enforce a contractual obligation of the guarantor. We're going to go there. Where's our support? Your Honor, point taken. The TIF pledge acknowledges both alternatives. It acknowledges the bank becoming the holder and owner of the note and it acknowledges the possibility of a sale. And the UCC requires that any agreement that's governed by the UCC be read subject to an implied covenant of good faith and fair dealing. And if you look at the TIF pledge through the lens of the implied covenant of good faith and fair dealing, it presents a situation where the TIF pledge acknowledges two options. The UCC supports a reading where one of those two options has to be chosen. And so we're just asking the court to acknowledge based on UCC interpretation principles, the TIF pledge should be read to require a choice, not allow for a situation where the secured creditor has unbridled discretion to sit on the collateral and do nothing with it. And I might add an important factual point here that seems to perhaps have been lost in the record to the circuit court. The bank has referred to the Poplar Creek development as a failed development. There's a critical time period issue here during which the Poplar Creek development was viable. There was a default called under the note and then two months later the bank took possession of the note. The property sat there pre-bankruptcy for six months. But this is all irrelevant to the issues. That was another case. Your Honor, I was trying to draw the point that that the bank has rebutted the value presumption that arises under section 9626 of the code. Your argument is that here the bank is getting a windfall. That's really kind of where you're going with this, correct? The bank is definitely getting a windfall, Your Honor. Yes. But we had two experts to testify at trial and neither expert really gave a value of this TIF note. And arguably your opponents are arguing that it's worthless. That it's not worth anything. And if it were to be worth anything, in order for the bank to be getting a windfall and be able to receive nothing from anyone else, it would have to be, based upon all the calculations, it would have to be worth at least $2.5 million. Is that correct? Is that where you are with it? That is correct insofar as the number on the valuation of the TIF note, Your Honor, I think it was, that sounds correct. I'd have to go back and check the record. But the concept, Your Honor, is articulating The original amount was $3.5 million. We know that. But then payments, tax increment payments were made along the way. And they've stopped making payments, tax increment payments. And the reason why arguably, the reason why they stopped making tax payments is because now it's worthless. Because the Poplar Creek extravaganza, if you will, never took place. Nothing ever happened. Is that all correct? It is correct that the Poplar Creek development is no longer viable. And it's correct that the TIF payments have stopped. But the TIF payments that were made in the interim period here, none of those payments were credited to the judgment debtors. And then retrospectively But they were credited to the judgment. And that's pretty clear here. That they were definitely credited to the judgment. The one point, I don't have the numbers in front of me right now, but I'm just too buff to talk from my head. And so approximately $1.275 million, which is what was received from the tax increment that was applied. The $905,000 paid by Mr. Walsh was applied. And the $2.1 million that was received from the bankruptcy purchase of the real estate was applied. And that's where you subtract that from the amount of the judgment. And that's where they're getting the approximate $2.5 million. And so that the amount that's owed right now, and of course this may not include to the extent that interest is still accruing at post-judgment rates, but that means that your clients, I shouldn't say your clients because you only represent one of the three, but it means that these individual guarantors owe about $2.5 million. Your Honor, I agree with the court's math insofar as those are the amounts. The issue we have is those amounts ought to have been applied to the guarantor's liability as opposed to being applied to Poplar Creek. And that's where the UCC comes in. That's where these notions of needing to make a choice under the UCC come in. There was a valuable piece of collateral, the TIF note that wasn't properly handled by the bank under the UCC. And the UCC protects debtors just as it protects creditors. And the presumption... You have two experts. Neither of them could give a price on it because there's no market for it. And your experts he just said, well, there's a market for everything, whatever that means. So you just said it was valuable. And Justice Walker said, we were talking about windfalls. The cases you rely on are windfalls. So valuable, we need to codify it. And I think that's part of what Justice Walker's saying. He codified it. Where's the windfall? Where's the value? And before he answers Justice Simon, let me just add to the question. Tell us what the value is of the TIF note. Because that's not anywhere in the record. So if you're able to tell us, tell us. And then we'll let Mr. Levin tell us as well. The value of the TIF note has to be examined as of the time of the default. And I mentioned that six-month dormancy period between the time the bank took possession and the time of the bankruptcy. At that time there was still a guaranteed revenue stream of multiple years on the TIF note. That interest was paid out. And that interest wasn't credited to the judgment debtors. It was credited to the obligation of Poplar Creek. Which they had a right to do under the documents, correct? Correct? You can disagree, but it is what the documents do. They were following the agreements. And that's where we're parting ways, Your Honor, in terms of whether the bank had the right to do that under... But just a second, Mr. Horvitz. I want you to finish because I want to come back to Justice Simon's question. But the agreement said that the bank could do whatever they wanted to do. Didn't it? You disagree with the agreement. Is that what you're saying? Your Honor, I don't think the agreement said the bank could do whatever it wanted to do. Okay, those are not the exact terms because I don't have the language in front of me right now. So that's not the exact language. The language that the bank could apply the funds in, if I'm not mistaken, it said in either way the bank sees fit. Shall not be obligated. Okay, there you go. Thank you, Justice Johnson. And the agreement, and we're not disputing that the agreement... I'm doing all this from memory, so I don't have my notes in front of me right now. Understood, Your Honor. We're not disputing that the TIF pledge agreement references both the sale and the possession of the note. Our point to the court is that the TIF pledge agreement has to be read against principles set forth in the UCC. And under our reading of the UCC, there's a binary choice that must occur. Acceptance or sale. And because sale didn't occur and because the bank takes the position acceptance didn't occur either, there was not a commercially reasonable disposition of the property under the UCC. Now, we've also set forth that the note actually was in fact accepted by the bank because in accordance with the terms of the TIF pledge, the bank decided to become the holder and possessor of the note. And in doing so, the bank accepted the note through an authenticated record, through a signed document, through the TIF pledge, and that alone ought to trigger the satisfaction obligations, the acceptance itself. But to the extent the court isn't amenable to the acceptance argument, we're tendering to the court a reading of the UCC that requires the bank to act in a commercially reasonable way with respect to the collateral in question, which requires a reasonable sale. And since no reasonable sale was put forward by the bank, the bank didn't attempt to sell the note at all, it triggers a presumption under the UCC. And the presumption that's triggered is the presumption that the value of the collateral does in fact exceed the value of the debt. So we're using the UCC to impose order on a situation that needs order imposed. If it's not imposed, the bank has unfettered discretion to decide how it's going to dispose of the collateral. Let me just jump in here, but the pledge is a specific attempt to address those parts of the UCC. It specifically says yes, the UCC, or it can be presumed that they acknowledge that the UCC does have this requirement of sale. However, we are specifically stating that the bank does not have to sell in this instance. So they've agreed not to comply, and I use the word required, that was an error because it doesn't require, it says it may. So they specifically addressed it. I think that is the pledge was added to the agreement. Don't you agree? With regard to the pledge, Your Honor, I think the provisions Your Honor was alluding to may have been the provisions in paragraph 8 that allow the bank to withdraw from a noticed sale. Our interpretation of paragraph 8 isn't that the bank has unfettered discretion to walk away from a sale with no consequences. It just says that if the bank has noticed a sale, has already scheduled a sale to occur, it can cancel that sale without penalty and then reinstate the sale. It doesn't negate the bank's obligation to attempt to sell the collateral or alternatively to accept the collateral. So with regard to paragraph 8 of the TIFF pledge, I think the reading is more specific than the reading the circuit court attributed to it. In the case that supports your position on that? Your Honor, I reiterate the cases that we've cited are the cases from other jurisdictions that talk about this dichotomy between the acceptance provisions and the disposition provisions. And we think there is support in those cases. There are windfall cases under different circumstances. So there isn't much support. I mean, at least you can see there isn't much support for what you're saying, particularly in a situation like this one. The support that we've been able to find for our position comes from those four cases from other jurisdictions, the comments that I alluded to earlier in my remarks, and basic principles of statutory construction under Illinois law, Your Honor. Okay. Attorney Horvath, you are out of time. However, you do have three minutes in rebuttal. Attorney Levin, you may proceed. You are muted. Thank you, Your Honors. And thank you all. I want to go right to a very key point to follow on the reasoning that Your Honors have already been discussing with Mr. Horvath, and that is this concept of the TIFF note's value. That's correct. We don't know its value because it was valueless. And two experts had said that. But even so, the judgment debtor guarantors expert was, in fact, no expert. In fact, I quote, he was superficial and speculative. That is from Judge Hennigan himself, because he had zero experience with TIFF. He didn't even know what a TIFF was. I had to explain to him what a TIFF was. It's all in the transcript. He was working on a case involving a TIFF and couldn't answer any of the specific questions about what that meant to be working on a case that involved TIFF. As Your Honors all know, and as you've already pointed out, a TIFF is very dependent. A TIFF's value is very dependent on a tax increase. If there's no tax increase, there's no benefit of the TIFF. But this TIFF had an interest provision. So the only value that we could ever attribute to this TIFF, per the testimony of our own expert evaluator, was the income stream. But when I asked their own expert whether or not there's value in the income stream, he agreed. But I said, well, if we hold the TIFF and take 100% of its value, would that be more, and therefore more of a credit against the loan value, than if we sold it at a discount? And he said, yes. So we didn't take this collateral and put it in a drawer. Every one of the interpretations, and every one of the cases cited by counsel in his briefs, and he's advancing here today, are cases that paint creditors as bad people. They did something wrong. They're seeking a windfall. They held the collateral in a closet. And they didn't sell it when they could have sold it, and there could have been value that could have been realized that was applied. The bank did the best thing it could do with the TIFF for everybody's benefit. They collected the revenue that was remaining on the TIFF. So your argument is that if they had done what Mr. Horvath is saying, they would have had less money. Much less. Right. Significantly less, because their expert is a consultant. Do you believe that even if they had done it back in 2017? Yes, Your Honor, because you pointed out that this was a failed development. Yes, it absolutely unequivocally was a failed development, vis-a-vis the TIFF. A TIFF specifically, as you know, TIFFs are granted by statute. The municipality has to apply. There's lots of governmental agencies that come in and create the TIFF. The bank didn't create the TIFF. The borrowers didn't create the TIFF. This was a TIFF district. Because it was a TIFF district, it's an opportunity for developers, they are incentivized to develop. And what they do is they know that they're going to get some money back on their development costs because they're being promised that increment between the taxes at the time they start the development and the taxes once they fully lease it or occupy it. That's the basic workings of a TIFF, which Mr. Samuels, the alleged expert, knew nothing about. And our expert knew a lot about. Counsel, can you address the argument that the $4.2 million that your client received should have been credited towards what the judgment debtors owed? Absolutely. Let me start with this clarification. When Mr. Horvath opened up his arguments, he said that he's asking the court to reverse a judgment. No. Let's be perfectly clear. We're here not because of a judgment. We're here because years after the judgment was entered against these guarantors, they decided maybe there's an argument that says that this TIFF should somehow offset the judgment amount. In fact, they raised it in their motion for reconsideration of the judgment before it came to this court years back. And then they never followed through on it. And then they revisited it a couple of years by filing this petition for satisfaction. So I want to be perfectly clear. There is the borrower who went into bankruptcy. These are the guarantors. As your honors know, I'm sure you've seen it many times before, the guarantor's obligation kicks in upon default. Not upon everything that happened over there in the bankruptcy court. Not with respect to settling with another judgment debtor at some point after the judgments against these judgment debtors are entered. Their obligation is created in the time of the default. We sued them as guarantors to ascertain the value, their obligation. Their obligation on judgment day, which was reviewed by this court and affirmed by this court and clarified by this court, is in fact the $600,000 base plus the $1.7 million worth of taxes. And there's the nuances of how much you can collect against each versus how much you can collect from any one, etc., etc. Joint and several discussions which are not relevant here. Let me be clear again. There have been $0 paid by those judgment debtors against their judgment, and there are no obligations written anywhere, not cited in any authority, not contractually obligated, not obligated by any court order that says that any money that was collected in the bankruptcy process needs to be given as a credit to these judgment debtors for their guarantee. But the TIF money was not collected as part of the bankruptcy. Well, actually there's a bankruptcy court order because the TIF was discussed in the bankruptcy. It was put forth in the bankruptcy, and it was turned over to the bank in the bankruptcy. So during that bankruptcy proceeding, the bankruptcy judge knew all too well about the existence of the TIF, and there's an order that says that the proceeds will apply to the Poplar Cleek obligation. And then Walsh also paid $900,000. Is that correct? That's correct. Okay. Now, even if we took the money, he still paid something towards it. Yes, he did. So he satisfied his obligation. That settled his obligation. He's just one of the four judgment debtors. So he took care of his obligation, and the credit went towards the overall amount owed under the obligation. And let me remind you, these guarantees are 10% guarantees. So they're only partially guaranteeing the obligation of the underlying debt. Well, as Judge Hennigan pointed out, that underlying debt, we're done collecting. There's no more assets for Poplar. There's no more money that they can possibly get. There's no more money that can come in from a TIF. There's no more money that can come in from settling with anybody. The bankruptcy is done. The property is sold. That's it. There's no more money to get from Poplar. And yet there's still a balance due on the loan. And that's what these judgment debtors have guaranteed. Judge Hennigan has also pointed out the massive amount of interest and attorney's fees that have happened since the date of the judgment. Those won't be calculated until judgment day. But mind you, eight briefs on this petition alone, plus fraudulent transfer claims and all the rest of the conduct that's been going on since the 2019 judgment in this case, there's a lot of money that's been spent. So there's going to be a lot more that's owed. So we are way past anything that they could ever attempt to offset with Mr. Walsh's payment or with the TIF payments. But the TIF payments were applied. They were applied to the taxes that these borrowers didn't pay. And they were applied to the insurance that these borrowers didn't pay. So if we just did some basic math, are you suggesting that the total loan initially was $8.1 and appellants are alleging that you've collected $4.2. And so there can't be a windfall because you're still out of at a minimum about $3.8. Well, I believe you're correct. Generally, Your Honor, but I believe that the loan balance was down to something like $6 and some change at the time of the bankruptcy. Forgive me for not having the specific numbers, but you're right in your analysis that there's going to be a deficiency and it wasn't Big Bad Bank holding on to collateral to make sure that we could stick the judgment debtors with an additional obligation. This was the bank doing everything it could to squeeze what it could out of these lemons in order to be able to apply money towards the overall obligation. The overall obligation is exactly what the judgment against these judgment debtors was based upon. And we gave them the credits that they were due against the obligation itself, just as the loan documents allow us to. And Justice Hyman and Justice Walker, you have driven that point home. Those documents allow us to apply the proceeds from the sale of collateral, from the sale of the TIF, if we did sell it, or the income that we received from the TIF, plus Mr. Walsh's payment, however we choose. And what we've been doing, and perfectly honest and upfront with them, and now showing it to the court, and all the documents that we prepared, and all the expert reports, and all the financial analysis, which the judgment debtors agreed to, because this was a joint statement of facts. There's no dispute as to a single fact here. Let me ask, just as a matter of usual process. I mean, I didn't see anything in the briefs to say that this particular transaction was unique. In other words, this is a typical transaction, considering the TIF, considering the property, considering the agreements, the documents, everything else. You take the whole thing, it's not like somebody created something unusual. Not rocket science. It's not rocket science. This has been done a thousand times before. Unfortunately, I think the thing that made it most unusual in this circumstance, before this court, is that a lot of people don't understand TIF financing. The very first thing... Are you talking about Mr. Samuels? We'll start there. Let's start there. But then there was also the idea that in the original petition for satisfaction, they wanted a $3.5 million credit, because that's what it said on the front of the document. Your honors know better. That's not it. TIFs are called notes, yes. They probably shouldn't be. TIF financing is a very unique animal, and a lot of people don't fully understand it. But its incentivization has been going on for developers for a long time, and again, it's a creature of statute. It's not rocket science. Whatever the village of Hoffman Estates decided to call it, it's not a note. The only obligation that was there was to pay interest.  Simple. A loan default. There's collateral. A piece of collateral is the TIF. The TIF allows for some payments of interest. Now the bank gets those. It wouldn't be fair to let Poplar get those. That's all. It's not rocket science. This is very simple. Loan guarantees. We've got default. There's a bankruptcy for the debtor. There's actions against the guarantors. We attempt to find collateral that we can use to satisfy any portion of it. The bank did everything commercially reasonable. Nobody has pointed a single finger suggesting that the bank, or nobody can support a point of a single finger. There's been a lot of fingers pointed, but nobody could support the finger pointing that suggested this was Big Bad Bank doing something wrong. To the contrary, this is the bank enforcing the very thing that these judgment debtors agreed to. Prior to the default, there were no guarantees. Great point. There was negotiation and renegotiation and loan modification. Let's look for new ways that we can help you, debtor, because you're in default. You're not paying. Let's modify the loan. If you really want us to modify it again, we'd like a TIF pledge. Because we know that that's going to provide at least some money that we can glam on to if you default. All part of a constant renegotiation of these deals. I remind you, this started back in 2004. My youngest child is in college now. She wasn't born then. This was a long time ago that these loan deals started. They've been negotiated and renegotiated. The TIF pledge was one way that the debtor could say, okay, here's something more that I can give you to make you comfortable with the idea that you're still going to let us have this money out there, even though we're not repaying it on time. It's not rocket science. At the time that you settled with Mr. Walsh, you had the $658,000 thereabout that each judgment debtor was responsible for. Then plus the taxes and interest, which is about $1.2 million. The $905,000 that Mr. Walsh paid was actually about a third of that number. It would have been his $658,000 plus a third of the $1.2 million. That's about what each of the other guarantors would have owed at that time. It was settled, but it was settled for about what was due at that time. Is that correct? Mr. Walsh would have owed much more than that. The way it's written and the way this court affirmed it when it went up on appeal last time, and I'm going to remind the court that it went on appeal last time relative to the judgment. This time we're not here about the judgment. The judgment's been affirmed. The right to appeal that further is long gone. When it went up before this court relative to the judgment, there was a very specific discussion about this joint and several liability. Everybody is basically obligated for the $600,000 and some change. At minimum, that's the base. We can collect that each. Correct. We can collect that each from everybody. Absolutely. The $1.23, whatever it is that you pointed out for taxes and insurance, we can only recover that once. If Mr. Walsh paid $9,000 and if we were required to apply that to the other judgment debtors, which we are not, there's been no side of the authority that requires us to do that. If we were required, there'd still be a lot owing, as you can tell, because that'd only be $300,000, so maybe even one-fourth, one-quarter of that other figure of the $1.23 on top of the six that we'd collect from the rest. Your point, where I think we were going with that, is there's still a big amount due. No matter what we recovered from the TIF, no matter what we recovered from Mr. Walsh, there's still a big amount due for each of these judgment debtors. The TIF can't possibly help them. Council, I know we've discussed the UCC at length with respect to the appellant, but I'd like for you just to respond to the argument that Article 9, Part 6 is permissive versus being mandatory or mandating that the banks sell the TIF note. There simply isn't a mandate, Your Honor. There's no mandate, and any such mandate would have been contracted away, and it's not against the law. Your Honors have already questioned Mr. Horvath on whether or not he's making law, and he's basically affirmed that he is. He's asking you to make law, because it doesn't exist. The requirement to sell doesn't exist. In fact, if we go straight to the heart of it, and that is what is commercially reasonable, we have two experts that say what we did was the most commercially reasonable thing we possibly could have done with the TIF. We even asked the judgment debtors, if you think it's a good idea to sell it, bring us a seller. Bring us a seller. But they can't. They never suggested in any of their papers to you that they've valued it, that they had a buyer, that anything, nothing, nothing. They complain and complain about the bank, but they don't take any actions or any steps to show us or you that there's a better outcome. The best outcome would be pay your bill. They also raise an issue of equity. Is it your argument that because the bank is still not made whole, can you address their equity argument? The reason I can't address it, Your Honor, is because I don't understand it. I simply don't understand where we're going with that. It doesn't make any sense. The bank has not been inequitable. The bank is doing exactly what it was allowed to do on their signature. I don't know what's inequitable. We haven't cheated them out of anything. This is just them trying to come up with a creative interpretation, an erroneously creative interpretation, for why they shouldn't have to pay their bill. It's nothing the bank did. What did the bank do wrong? Nothing. Their argument would be that the bank did not attempt to find a buyer for the note, the TIF note, back in 2017 at the date of the default, which is what Mr. Horvath believed is the magic date. Because the bank, Your Honor, knows what TIFs are. And the bank knows that there's been no tax increment. And the bank did what was commercially reasonable, which is all they're required to do. There would be no buyer. No one has told you or shown you or attested to you that, see, right here, if only they'd have done this, the outcome would have been better. They can't. It's impossible. It's an absolute impossibility. Because it wasn't worth anything other than the interest. And we gave them credit for the interest against the loan amount against which they are guaranteed. Okay. Any additional questions from the panel? Okay. You have one minute remaining, Attorney Levin. I think you've made your argument. But if you'd like to give us a conclusion or summary, you may. I think we've covered it all. I think we've beat it as much as it can be beaten. Your Honors, thank you very much for your time. Thank you very much. Attorney Horvath, you have three minutes for a rebuttal. Yes, Your Honor. Thank you. I'll start with a narrow point and then get broader from there. My first point has to do with this amount that was paid in settlement by Mr. Walsh. The bank decided to put Mr. Walsh's $905,000 settlement payment into a segregated account of some kind instead of applying that payment to the judgment. And that came to light through the testimony of one of the bank's senior vice presidents. She initially stated that the $905,000 was applied to attorney's fees accrued as of August 2019. And that those are reduced by $905,000. And then it came to light in further testimony that those were paid in a segregated account. And so the debtors haven't received any credit to date for that payment. And that particular niche of the case I think is specifically governed by case law about limited liability for limited guarantors. We've cited the Tiemann case, In re Estate of Tiemann. And Tiemann says that limited guarantors are relieved from liability to the extent of the proportionate value of their debtors. So that guarantor, Mr. Walsh, settled. And Mr. Walsh's settlement should have been immediately applied to reduce the liability of the other debtors. So that's the narrow point that I wanted to make. And the broader point, your honors, is in response to a comment that Mr. Levin made. Mr. Levin said, TIFF financing is a unique animal. And I agree with that. And we're attempting to apply the UCC, the standard provisions of the UCC, to that unique animal. And in applying those provisions, it becomes very clear that what happened here is the bank took possession of the note, sat on the note for six months after doing so, and is now years after the fact making an argument that the note had no value. And the relevant time frame for the valuation analysis has to be that initial period immediately after the bank took possession, rather than a retrospective evaluation through the assessment of the bank's expert. And as far as the equitable principles go, the UCC argument and the equitable argument do have some overlap. And the facts that apply to those arguments are coterminous with one another, but the equitable principles are different. And even if the court is not inclined to read the UCC in the manner that we have suggested, there is room and equity for the court to find that the judgment was satisfied based on the Campbell case and the Heller case that we've set forth in our briefs, each of which acknowledged that a creditor can't forever sit on collateral to the debtor's hardship, where the debtor expected that the collateral would satisfy its creditors. And that's what happened here. And subject to any further questions, I thank the court for the additional time on rebuttals. Can you just clarify the statement you made that the Walsh payment of $905,000 I'm sorry, yeah, $905,000 did not go towards the judgments of the judgment debtors? Are you suggesting that it did not satisfy his $658,700? No, Your Honor, that clearly took Mr. Walsh out of the equation, but the balance on that $905,000 was not applied in any way, shape, or form to the other judgment debtors who remain parties to this case. Okay. Any questions from the panel? No? Okay. Thank you both very much for your advocacy here today. You have given us a lot to consider. You both presented your arguments in an excellent fashion, and we will take it all under consideration and issue our opinion as soon as it is available. Thank you, Your Honor. Thank you very much.